### RAILROAD COMPANY *v.* FREMONT COUNTY.

The proviso in the act of May 15th, 1856, to the State of Iowa, for aid in the construction of railroads, which excludes from the grant " all lands heretofore reserved by any act of Congress, or in any manner by competent authority, for the purpose of aiding in any object of internal improvement, or for any purpose whatever," excludes the lands granted to that State, among others, by the act of September 28th, 1850, known as " the swamp-land grant."

IN error to the Supreme Court of Iowa.

Fremont County, Iowa, filed a bill in one of the State courts of Iowa against the Burlington and Missouri River Railroad Company, to quiet the title to twelve thousand seven hundred and fifty-four acres of land, or thereabouts, situate in the said county, which the company claimed as belonging to it.   Both parties set up title under grants by acts of Congress: Fremont County, under what is known as " the swamp-land grant" to the State of Iowa, September 28th, 1850 ;* the railroad company, under a grant to the State for aid in the construction of railroads, May 15th, 1856.†

The title of Fremont County, the complainant, was as follows :

By the 1st section of the act of September, 1850, it is provided " that to enable the State of Arkansas to construct the necessary levees and drains to reclaim the swamp and overflowed lands therein, the whole of those swamp and over-

---

* 9 Stat at Large, 519.            † 11 Ib. 9.

flowed lands made unfit thereby for cultivation, which shall remain unsold at the passage of this act, shall be, and the same are hereby granted to said State."

Section 2d provides " that it shall be the duty of the Secretary of the Interior, as soon as may be practicable after the passage of this act, to make out an accurate list and plats of the lands described as aforesaid, and transmit the same to the governor of the State; and, at the request of said governor, cause a patent to be issued to the State therefor; and on that patent the fee simple to said land shall vest in the said State, subject to the disposal of the legislature thereof. provided, however, that the proceeds of said lands, whether from sale or by direct appropriation in kind, shall be applied exclusively, as far as necessary, to the purpose of reclaiming said lands by means of the levees and drains aforesaid.

" Section 3d. That in making out a list and plats of the land aforesaid all legal subdivisions, the greater part of which is ' wet and unfit for cultivation,' shall be included in said list and plats; but when the greater part of a subdivision is not of that character the whole of it shall be excluded therefrom.

" Section 4th. That the provisions of this act be extended to, and their benefits be conferred upon, each of the other States of the Union in which such swamp and overflowed lands, known and designated as aforesaid, may be situated."

Under this last section the State of Iowa became entitled to the benefit of this act. After its passage the only important steps to be taken to perfect the title in the State were the ascertainment and designation of the several subdivisions which fell within the description of swamp lands as defined in the third section. This duty was cast upon the Secretary of the Interior as the head of the land department.

On the 21st November, after the passage of the act, the commissioner of the land office issued instructions to the surveyor-general of the State to make a selection of these subdivisions, and report the same to the department;* and

---

* See also letters December 21st, 1853; January 22d, 1859, Lester's Land Laws, pp. 543, 551, 559.

also to transmit copies to the local land offices.   This duty was performed in accordance with the instructions.   The first list was returned and filed in the general land office September 20th, 1854, and in the local office October 23d, 1854. The second and remaining list was returned and filed in the general land office January 21st, 1857, and in the local office January 23d, 1857.   These two lists contain the whole of the lands in controversy.   On the filing of the lists in the local office the register was directed to make a note of the subdivisions in his tract-book, and to withdraw them from the market, which was done accordingly.

In this connection it may be proper to refer to the act of March 2d, 1855,\* which is "An act for the relief of purchasers and locators of swamp and overflowed lands."   It provides, in substance, that patents shall be issued to purchasers or locators who had made entries of the public lands claimed as swamp lands prior to the issue of patents to the States under the second section of the swamp-land grant of 1850, and providing for an indemnity to the States.   Conflicts had arisen between these purchasers and locators, on the one side, and the States claiming the land under the swamp-land grants. As these lands were not withdrawn from sale till the filing of the lists in the local land office, they were supposed to be open to entry or location, and a portion of them had been thus appropriated.   On the other hand, the States claimed that the grant to them by the act of Congress was a grant *in presenti* and vested the title immediately.   Such had been the opinion expressed by the land commissioner, and also by the Attorney-General.

The embarrassments of the land department growing out of this controversy between the States and the settlers were removed by this act of 1855, which confirmed the title of the settlers, and compensated the States for the land of which they were deprived.

The second section of the act provided that compensation should be allowed to the States only in respect to subdivisions

---

\* 10 Stat. at Large, 634.

taken up by the settlers, which were swamp lands within the true intent and meaning of the act of 1850; that is, where the greater part were " wet and unfit for cultivation." And the land department, therefore, allowed parties to contest the claim of the States, and to give evidence before the proper officers that the subdivision was not of the character contemplated by the law. As a consequence, under this construction of the act, controversies increased between the settlers and the States, and, as stated by one of the commissioners of the land office, the contesting applications pending before the department involved, by estimate, three millions of acres, and, on investigations being ordered, papers came into the office by bushels. Pending these proceedings Congress intervened and passed the act of March 3d, 1857.* This act is entitled " An act to confirm to the several States the swamp and overflowed lands selected under the act of September 28th, 1850, and the act of March 2d, 1849."

The act contains but one section, and it provides " that the selection of swamp and overflowed lands granted to the several States by the act of Congress, approved September 28th, 1850, and the act of 2d March, 1849, heretofore made and reported to the commissioner of the general land office, *so far as the same shall remain vacant and unappropriated, and not interfered with by an actual settlement under any existing laws of the United States,* be, and the same are hereby confirmed, and shall be approved and patented to the several States, in conformity with the provisions of the act aforesaid, as soon as may be practicable," with a proviso saving the act of March 2d, 1855, which is continued in force and extended to all entries and locations, claimed as swamp lands, made since its passage. As we have already stated, the selection of the swamp and overflowed lands by the State of Iowa, under instructions from the land department, involved in this suit, was made, and lists returned and filed in the department September 20th, 1854, and January 21st, 1857, which was before the passage of this act. And these are the selections referred

---

* 11 Stat. at Large, 251

to, confirmed, and approved, and for which patents were directed to be issued as soon as practicable, if the same were vacant and unappropriated, or not occupied by an actual settler under some law of Congress.

So far as respects the title of the complainant, Fremont County.

The title of the railroad company, which, as already stated, was under the act of May 15th, 1856, was thus.  That act provides " that there be and is hereby granted to the State of Iowa, for the purpose of aiding in the construction of railroads from Burlington, on the Mississippi River, to a point on the Missouri River near the mouth of the Platte River " (naming also several other lines of railroads), " every alternate section of land designated by odd numbers for six sections in width on each side of each of said roads," and then provides that when the lines of the roads shall be " definitely fixed," if it shall appear that any of the lands within these six sections shall have been " *sold or otherwise appropriated,*" alternate sections may be selected of equal quantity within fifteen miles of the road.

To this grant is the following proviso :

" That any and all lands heretofore reserved to the United States by any act of Congress, or *in any manner by competent authority for the purpose of aiding in any object of internal improvement, or for any other purpose whatsoever,* be and the same are hereby reserved to the United States from the operation of this act, except so far as it may be found necessary to locate the routes of said railroads through such reserved lands, in which case the right of way only shall be granted, subject to the approval of the President of the United States."

The location of the railroad was not made on the ground and adopted by the company until March 24th, 1857.

The District Court rendered a decree declaring the right and title to be in the county, and the claim of the railroad company to be void.  The railroad company appealed to the Supreme Court of the State, which, after hearing, affirmed the decree of the District Court.  The railroad company now brought the case into this court for re-examination.

*The case was submitted on the record, with briefs of Messrs. Rohrer and Strong for the plaintiff in error, and of Mr. Harvey, contra.*

Mr. Justice NELSON, having stated the case in the way already given, delivered the opinion of the court.

It will be seen from an examination of the grant made to the railroad company by the act of May 15th, 1856, that the reservations annexed to it are very full and explicit. They are first found in the enacting clause itself, where provision is made for the selection of lands beyond the lines of the six sections on each side of the road, in case any of the sections have been previously " *sold or otherwise disposed of ;*" and then again in the general proviso to the grant. These reservations clearly embrace the previous grant of the swamp and overflowed lands for the purpose of enabling the States to redeem them and fit them for cultivation by levees and drains. At the time of the passage of this act (May 15th, 1856), a moiety of the lands in controversy had been selected and reported to the land department; and the authorities of the State, under instructions from that department, were engaged in the selection of the remainder. The lands already selected and returned had been withdrawn from sale, and were not in the market at the time of the passage of the act; and as soon as the remaining lists were returned, which was January 21st, 1857, they were also withdrawn from the market  In the language of the railroad act, the whole of the lands in controversy were " otherwise appropriated," and were " reserved " for the purpose of aiding the States in their objects of internal improvements.

But there is still, if possible, a more decisive answer to the title set up by the defendants. Until the line of the railroad was definitely fixed upon the ground, there could be no certainty as to the particular sections of lands falling within the grant; nor could the title to any particular section on the line of the road vest in the company. The grant was in the nature of a float until this line was permanently fixed. Now, the proofs show that the location of the road was not

made on the ground and adopted by the company till the 24th March, 1857, which was after the confirmatory act of that year.

This, as we have seen, confirmed all the selections made at the time, and which included all in controversy in this suit, in the language of the section, "so far as the same shall remain vacant, and unappropriated, and not interfered with by actual settlement." As the railroad company at this time, for the reasons above stated, had not perfected their grant so as to have become invested with the title to any of the sections included in the lists or selections of the swamp lands on file in the land department, they can set up no appropriation of any of these lands under their grant, which leaves them subject to the confirming act of 1857, according to the very words of it.

DECREE AFFIRMED.